**The GREYHOUND CORPORATION, Appellant,**

v.

**Mrs. Annie M. WILSON, Appellee.**

**No. 16437.**

United States Court of Appeals
Fifth Circuit.

Dec. 10, 1957.

Rehearing Denied Jan. 9, 1958.

William L. Clark, Reid B. Barnes, Birmingham, Ala., Lange, Simpson, Robinson & Somerville, Birmingham, Ala., of counsel, for appellant.

John D. Higgins, Birmingham, Ala., Taylor, Higgins, Windham & Perdue, Birmingham, Ala., of counsel, for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The sole question is whether, as a matter of law, the evidence was insufficient to support the jury verdict and judgment entered on it holding that the Bus Company breached its duty to fare-paying passengers to provide a safe exit from the Bus Company's depot at Tupelo, Mississippi.

Mrs. Wilson, a fare-paying passenger, received severe injuries in a fall caused, she claimed, by an abrupt and inadequately marked step-down at the exit door leading from the interior of the Bus Station onto the sidewalk area then being used as a loading ramp for an awaiting bus.

The facts, either virtually without dispute or resolved in the plaintiff's favor by the jury, are quite simple. Mrs. Wilson, a lady then of 70 years, about an hour before the accident entered the Tupelo Bus Station through the side door adjacent to the regular off-the-street loading platform or ramp. This entrance had two screen doors, each covering one-half the width of the opening, swung from either side. The weather doors, similarly hung, were apparently propped open to the inside of the station. The important thing was that the surface of the loading ramp, the threshold of this entrance and the interior floor of the depot were all on the same level.

When her bus was called, instead of its being parked on the side loading ramp from whence she entered, it was parked on the public street in the front of the station. This area was set apart by the city authorities as a bus loading zone, the curb was suitably painted yellow to indicate that fact, and the Bus Company regularly used the area, including the adjacent sidewalk, for embarking and debarking passengers.

After her bus was called, Mrs. Wilson, who had remained in the waiting room all this time, waited a few moments more knowing that some passengers would be getting off. Then, carrying a small case and a coat and following somewhat closely on the heels of another intended passenger ahead of her, she started out of the station by way of the front entrance. This entrance, as did the side one, likewise had double weather doors propped open to the inside, and two screen doors

hung from either side which, ordinarily kept closed, covered the width of the doorway. On each screen door, about chest high, there was a horizontal pushing strip and from this to the bottom frame (apparently about 6 inches in width) of the screen door, there were four protective vertical bumping strips spaced about six inches apart. Depending on the angle of vision, one could see through the screen mesh above the bottom door frame and between these vertical slats.

But (and the but is important) unlike the side entrance door, the surface of interior, threshold and adjacent loading-ramp-sidewalk was not level. On the contrary, the threshold continued from the interior in the doorway area beyond the outside edge of the screen door (in a closed position) for a distance estimated to be from about eight inches to a little over a foot and to a point a few inches beyond the brick wall of the building where it ended with a drop-off varying from two to three inches to the level of the adjacent sidewalk.

As she approached the exit, the screen doors were shut. She pushed the right one open in the usual way and, as she stepped ahead while turning toward her right (angling toward the forward end of the bus), this sudden drop-off, unknown to her and which she had not seen, caused her to lose her balance, fall, and, it turned out, break her hip.

Because the record showed that no one testifying (including the long-time station manager) had ever known of any person falling from this drop-off and the plaintiff herself acknowledged[1] that she had not looked down at the threshold as she opened the screen door and passed over it, so that she was never able to say whether she could have seen this change in elevation, the Bus Company insisted that, whether the standard is ordinary or the highest degree of care, there was no evidence that this exit and step-down was not reasonably safe.

■ Since it is not our function as we make our way with our *Erie* lights to *make* uncertainty where none exists, we think that, at the outset, we must assume[2] under the present declaration of Mississippi law,[3] West v. American Telephone & Telegraph Co., 311 U.S. 223, 85

1. The Bus Company is careful to point out that it is not here urging contributory negligence as a matter of law. It acknowledges that by proper instruction the Mississippi doctrine of comparative negligence, Title 10, Section 1454, of the Mississippi Code of 1942, was submitted to the jury for apportionment of the damages. Within the framework of the narrow appeal presented, the Bus Company may, with propriety, argue that this is an ingredient of the question whether this step-down was reasonably safe since, of necessity, that involves an inquiry as to what reasonably prudent persons in the exercise of ordinary care would be able to observe. I. e., the test of fitness is whether the facility " * * * might be used without danger by a person exercising ordinary care," Wessner v. Blue Ridge Transportation Co., 338 Pa. 161, 12 A. 2d 559, 560, and is " * * * in such a reasonable and suitable condition that passengers and others authorized to use them may, in the exercise of ordinary care, use them in safety. * * *," 13 C.J.S. Carriers § 713, page 1327.

2. The District Court so charged the jury and, while the Bus Company took exception to it, in the forthright frontal attack it makes here it does not now, either by brief or by the specification of the single point for appeal under Fed. Rules Civ.Proc. rule 75, 28 U.S.C.A., urge it further.

3. The rule seems to come through with inperceptible mutations as it passes through this genealogy: Illinois Central R. Co. v. Daniels, 96 Miss. 314, 50 So. 721, 722, 27 L.R.A.,N.S., 128,
   " * * * Passengers do rely, and under the law have a right to rely and act, upon the duty of the railroad company to exercise the highest degree of care in providing for their safety in going to take the train, in alighting from it, and while actually en route * * *.
   " * * * While it is unquestionably true that even a passenger is not absolved from all care, it is equally true that it is the duty of the railroad company to exercise the highest degree of care in providing for the safety of a passenger going to the depot for the purpose of boarding its trains."

L.Ed. 139, 132 A.L.R. 956; Six Companies of California v. Joint Highway Dist. No. 13, 311 U.S. 180, 61 S.Ct. 186, 85 L. Ed. 114, that, in Mississippi, a common carrier owes a fare-paying passenger the highest degree of care to make the premises and facilities for getting on and off the conveyances safe.

Applying this Mississippi standard, the question, in view of the constitutional guarantee of a jury trial under the Seventh Amendment, then reduces itself to the classic inquiry: must we say that reasonable minds could not possibly conclude that a common carrier ought reasonably to have anticipated that this drop-off might cause injury to its patrons

and that a reasonably prudent carrier would then have taken some suitable means to alert the patrons to the presence of this hazard? Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498; American Fidelity & Casualty Co. v. Drexler, 5 Cir., 220 F.2d 930; Hanover Fire Insurance Co. v. Argo, 5 Cir., 251 F. 2d 80.

■ There is first a now unassailable[4] finding that it was this drop-off which was the proximate cause of the passenger's injuries. Next, the physical arrangement of the screen doors was such that while they were in the closed position, the view of one approaching the door to go through this exit was com-

---

Yazoo & M. V. R. Co. v. Smith, 103 Miss. 150, 60 So. 73, 74, "It will be noted in this case that appellee became the passenger of appellant when she purchased her ticket and went into appellant's station, that she was thereupon entitled to receive the highest degree of care and attention * * *." Illinois Central R. Co. v. Small, 113 Miss. 857, 74 So. 681, 682, "This court, in the Smith Case, 103 Miss. 150, 60 So. 73, seems to have approved the rule [highest degree of care] adopted by the trial court in the present case." Meridian Terminal Co. v. Stewart, 143 Miss. 523, 108 So. 496, " * * * we will assume for the sake of argument that they [railroad] should have exercised the highest degree of care so to do * * *" citing the Daniels, Smith and Small cases. And see also Yazoo & M. V. R. Co. v. Hawkins, 163 Miss. 505, 140 So. 873. While the Daniels rule is assumed arguendo in Small and Stewart, we cannot, as the Bus Company contends, read into that and the court's use of expressions of due care to maintain premises in a reasonably safe condition in the later case of Gulf, Mobile & Ohio R. Co. v. Smith, 210 Miss. 768, 50 So.2d 898 (not a passenger situation), a purpose on the part of the Supreme Court of Mississippi to repudiate in any such oblique fashion its rule so plainly and earlier stated.

4. The Bus Company emphasizes, of course, that even Mrs. Wilson was quite vague just how or why she fell. But the issue was submitted to the jury whose answer under the general verdict was necessarily favorable and in its motion for directed verdict, which is at the bottom of its present request for

j.n.o.v., the sole specific ground urged by the Bus Company related to duty and breach of it, not causation:

"2. The evidence is not sufficient to warrant submission to the jury of the question of whether the defendant negligently failed to provide plaintiff with a reasonably safe place to walk in defendant's bus station."

Of course the fact that this precise type of accident had not occurred before does not insulate the carrier from that which ought reasonably to have been anticipated for, half a century ago, Texas & P. Ry. Co. v. Carlin, 5 Cir., 111 F. 777, 781, 60 L.R.A. 462, affirmed 189 U.S. 354, 23 S.Ct. 585, 47 L.Ed. 849, we said:

"It may be true that the negligence in this case produced an effect not before observed, the circumstances of which could not have been anticipated. But, if it was negligence likely to produce other and familiar injuries, the peculiarity of the accident does not prevent liability. Doyle v. [Chicago, St. P. & K. C. Ry.] Co. [77 Iowa 607], 42 N.W. 555, 4 L.R.A. 420. The extraordinary circumstances attending the injury cannot serve as a defense. To so hold would be to say that a plaintiff must show similar injuries to have occurred in the same manner before he could recover. And it would lead to the anomalous result that for the first, and perhaps the second, injury occurring in such manner there could be no recovery; but for the third, or when the circumstances ceased to be peculiar or became familiar, the defendant would be liable."

See also Johnson v. Kosmos Portland Cement Co., 6 Cir., 64 F.2d 193, 196, 1933 A.M.C. 1023, 1028.

pletcly obscured by the bottom frame, partially obscured by the vertical bumping strips, and partially reduced, if not obscured, by the screen mesh above and between these pieces. We would, of course, have to recognize that in the daytime (as this was) one looking directly out through the bottom screen mesh could see something. But there was no proof here that one would necessarily have seen this drop-off.

Assuming that the prudent person must necessarily have been looking down, out and through the screen door before essaying the continuous movement of pushing the door open and simultaneously advancing through it, it was for the jury to say what that observation would have revealed. But whether any such *assumption* should be made, itself involved a question which is the very stuff of ordinary care. Since the application of this standard of review (i. e., no reasonable minds could conclude otherwise) necessarily places judges, in their everyday human experiences, in the middle of the problem, we certainly have to acknowledge that it is not the custom and habit of careful people generally to walk with their eyes directed downward as though they must be expecting some sudden change in elevation, the presence of a stumbling block or the existence of some extraneous foreign substance. Of course, where there is some reason to anticipate any such likelihood, it is just as much the custom and habit of prudent people generally, by looking downward or otherwise, to take special pains to avoid or minimize the hazard. But whether it is one or the other, whether the theoretical prudent person would or would not have looked, and whether, looking, would reasonably have seen, are inherently matters on which reasonable minds might normally differ.

Certainly that would seem to be true where, as here, the doors were customarily in a closed position and there was nothing to indicate that, upon the opening of the door, there would be a marked and sudden drop-off. Mrs. Wilson several times testified that "it appeared to be level." And we think reasonable minds might have concluded that the prudent bus passenger did not have to anticipate [5] that just beyond the door there was a situation which, if unknown, had the capacity for harm.

It was likewise for the jury to say whether, had she looked down as she opened the door and advanced through it, she would have seen the drop-off. The threshold was apparently of cement, as was the adjacent sidewalk. Whether the leading edge of the threshold would stand out and the existence of the drop-off be readily discernible to one walking and looking, as the Bus Company could anticipate passengers would be doing, was inherently a fact question. In this connection, the jury had at least two circumstances to justify its inference that it was not readily discernible to one looking while walking through. First, the Bus Company customarily painted it a bright yellow, presumably to emphasize its existence. But the most the Bus Company could show here was that it had probably been repainted within the past nine months or so and, its own witnesses, then had to acknowledge that on the curbing and the entrance, the yellow paint markings would be worn off by use and traffic. No one could say how much, if any, yellow paint remained at the time of Mrs. Wilson's injuries. Second, in some of the photographs procured and introduced by the Bus Company portraying a view which a passenger would have in leaving the station, it was, to several

5. See note 3, supra, and see, e. g., Illinois Central R. Co. v. Daniels, supra, " * * This duty of the railroad * * * is so imperative * * * that it justifies a passenger in assuming that this high duty will be faithfully performed. The duty of the company to protect its pas-

sengers is so imperative and may be so relied on as not to make an act done by a passenger negligent, although it might be negligence in one not holding the relation of passenger to the company."

**514**

key witnesses, almost, if not actually, impossible to make out the edge of the threshold or the fact of any drop-off. Granted that this was an everyday garden variety of controversy typical of today's tort litigation in which the parties vie with great heat over the extent to which photographs are a true portrayal or an illusion, we would be presuming indeed if we, in our remote tower, would say *all* men *must* have seen that which is not shown or, to many, was at least obscure.

■ It is unnecessary for us to elaborate on the possible distinctions between this situation and that presented in cases so heavily [6] pressed by the Bus Company. We think that this inherently was for the jury to decide whether, with this arrangement of the screen doors and threshold, some suitable warning, by notice, sign or otherwise, might reasonably have been provided to alert the passenger to a hazard momentarily undisclosed and which might not reasonably become discernible while opening and passing through the door in the normal course of events, Brown v. American Airlines, 5 Cir., 244 F.2d 128.

Affirmed.

JONES, Circuit Judge (dissenting).

The step was not defectively constructed nor was it improperly maintained. It is not negligence, it seems, to have a step beyond a door. Supreme Instruments Corporation v. Lehr, 190 Miss. 600, 199 So. 294, 1 So.2d 242. Here, I think, the negligence was in the stepping, not in the step. The majority opinion indicates that there should have been a sign or notice of the existence of the step. Since the appellee did not see the step I am unwilling to assume she would have looked for a sign. Unable to join in finding any negligence of the appellant, I dissent.

Rehearing denied: JONES, Circuit Judge, dissenting.

6. See Dominguez v. Southwestern Greyhound Lines, Inc., 49 N.M. 13, 155 P. 2d 138; Cates v. Evans, Mo.App., 142 S.W.2d 654; Wessner v. Blue Ridge

Transportation Co., 338 Pa. 161, 12 A.2d 559; Van v. Teche Lines, Inc., La.App., 164 So. 267.